Thank you, Your Honor. May it please the Court, my name is Scott Lively. Along with me is Richard Ackerman. We respectfully point out that our clients are present in court today. And I'll be addressing the First Amendment and free speech claims and pickering as it applies in this case. And Mr. Ackerman will address the equal protection claims and standard of review issues. This case is about the speech of my clients whether the City of Oakland can restrict my clients from using the phrase natural family, marriage and family values under the city's anti-discrimination policy. The city claims, the defendants claim that the terms, the term natural family, marriage and family value is homophobic and that it falls under an administrative instruction 71 which prohibits speech that demeans, degrades, shows hostility or aversion to people who are members of protected groups. And they say that this phrase natural family, marriage and family values demeans and shows hostility toward people who are covered under the category of sexual orientation. Both sides agree that the case that rules here is pickering and the balancing tests that says that employees have a right to freedom of speech in the workplace but that right is subject to an employer's right to restrict speech that's disruptive to the workplace. Excuse me, just taking a step back from pickering for a moment, are we looking at really whether there's a qualified immunity test and whether these rights are clearly established? Mr. Ackerman has prepared for that question. He'll be coming up shortly. I'm going to just take just less than three minutes here to just address the First Amendment question. The pickering was used by this court in two cases that were cited by the defendants. The first was Lumpkin v. Brown and the other was Peterson v. Hewlett-Packard. Both of those cases involved individuals who used specific Bible quotes to condemn homosexuals publicly, specifically the quote out of the Old Testament that says that men who have sex with other men deserve death. And it's reasonable for an employer to conclude that the offensive use of select scriptures to publicly condemn coworkers is disruptive to the workplace. But the facts in this case are very different. My clients met the challenge of the promotion of the gay and lesbian position in their workplace not with attacks on the messengers or with attacks on their employer. They invited coworkers to dialogue on the issue and posted a flyer that just simply said, these are the issues we want to talk about, natural family, marriage and family values. They didn't even express their opinion about those on the flyer. The city took it down. It's not hard to figure out from the flyer what their opinions are, is it? Yeah, but these are stated in the most moderate possible terms. I can't think of terms that would be more moderate. Let me try this. Come to a forum to discuss whether same-sex marriage should be legalized. Yes, that would be stating it truly in the neutral. But my clients are not denied the ability to express or to indicate where their position is. But they've stated it. And they're free to say, we support the current statute, which is in fact, the current statute of California is interpreted by the courts and adopted by the people. So I'm not saying there's something wrong with the position. But you could state it in a way that doesn't suggest that people who don't fit within that framework, that they don't have integrity. I guess the word integrity is the one that I sit there staring at that flyer and saying, well, what exactly is being suggested by this flyer? That if you aren't married to someone of the opposite gender, you lack integrity? The flyer addressed those questions of sexual morality. And my client's view that does raise questions of integrity in the workplace, whether or not the workplace is going to be a place where this particular speech is going to be one-sided. And they met that challenge with Thomas. Well, it doesn't seem to say that we shouldn't talk about it. Indeed, this is a forum where they want to talk about it. So presumably, if they want to talk about it, they want to hear from the views that express support for the concept of changing the state statute. I look at this and I say the suggestion, maybe we don't want so many of those people that aren't adhering to the standards that we want to apply. If we have too many of those people in this workplace, then something's wrong with the workplace. Part of preserving integrity in the workplace, was there any suggestion that integrity is lost, other than the notion that if we have too many of those people in the workplace, we're going to go bad? Well, it isn't addressing the people, it's addressing the subject matter. And the integrity of the workplace goes to the question of what are the ideas and concepts that we can talk about here? Can we only talk from the perspective that homosexuality is good and same-sex marriage should be endorsed? I offered the alternative. I said you can have a flyer that says, come talk about the statute. We support the existing statute. We support the statute that requires marriage be limited to persons of different genders. If I could say that, and that would not appear to offend the administrative interpretation. Certainly, they could. But the real question comes down to what they did say. If it is disruptive enough to the workplace to fall under a category that's equal to someone saying that men who have sex with other men are deserving of death. I mean, this is, we're talking the opposite ends of the continuum of speech that addresses homosexuality. Counsel, this is kind of a balancing test. And I would suggest that your clients have a rather low level of protection in saying things that are likely to incite concern and problems within the workplace. And the workplace employers have a rather low level in preventing all discussion and all things that might lead to a disturbance in the workplace. And it seems to me that the balance is not clearly in the favor of your people. They're allowed to advertise a meeting. They're allowed to invite people to come to it. And the city lets them put that on their bulletin board or whatever. Just keep away from words that will get people all riled up. Well, but shouldn't that be a two-way street? I mean, my clients were confronted with the promotion of the gay position in the workplace. That was disseminated through the city-wide email system and other literature that was around the workplace. But here, wasn't there a specific concern was raised about this? There was a single flyer that was put on a bulletin board. The employee raised a concern. The employer investigated and decided, you know, this is causing, this single flyer is causing a disturbance. There was nothing in the record about the flyers that were promoting gay pride or whatever the other message was were causing a disturbance in the workplace of that sort or an investigation was raised. Exactly. My clients showed tolerance to speech in the workplace that was offensive to their values. But they're not being granted any tolerance for their speech, which is very moderate in these terms. Is there anything in the record, and you have to understand, much of the discussion, I've read your brief and it's powerful in certain respects, but there's no record citation there to tell me what it is that they're complaining about or what to compare it to. I just don't, you can tell me that, look at this outrageous thing that our people have to tolerate, but just telling me that doesn't get us any place. Is there something you can point to in the record specifically that would be deemed offensive to an individual, something that disparages that individual? That's not just disagreement with belief. That's the distinction I was trying to draw before. Is there anything there that suggests the city is willing to permit disparagement of your clients and not willing to permit disparagement of anybody else? Yes, and as a matter of fact, the incident that led to this was the dissemination of an email through the city-wide email system about Happy Coming Out Day. And that included an invitation to a rally against hatred and bigotry. And that, in conjunction with the city's- To your clients? A rally against hatred and bigotry? Is that disparaging to your clients? Well, to suggest that there, well, it goes to what Defendant Hicks said in her deposition. That homophobia, in her definition, means any speech at all that expresses disapproval of homosexuality. Any speech. Meaning that there's nothing that you can say that is not homophobic. And that that's the basis for restricting the speech on the flyer. That's just simply cannot stand. That silences the viewpoint of an entire category of people that represent millions of Americans. Well, I pose the question, and you didn't seem to disagree, that the city isn't going to have a problem with something that says, come talk about legalization of same-sex marriage. We oppose legalization of same-sex marriage. But that's not speech in the workplace, Your Honor. That's just simply come and talk about something in another room. That's not in the workplace. That's not to the extent that the Gay and Lesbian Employee Association had access to disseminate their views. You can express a political position, and it seems to me the city's policy, and frankly, I'll say right now, I think there are eggshells on both sides, and I can understand Judge Walker's frustration with this case, because I think the city has some serious questions to answer on that front, too. But there is a difference between saying, I take this political position on an issue of public concern, and I don't think that person over there should be allowed to be here. Oh, of course. I would agree with that. Or I think that person is bad because he practices something that I think is evil. Absolutely. And I'm trying to find out if there's anything comparable aimed at your clients. Is there anything that says something about your clients such that they are not, we disagree with their political views, but they are evil, they are bad? No. Well, on neither side are there offensive statements targeted at any individuals. Neither party says anything. The city's position is, I think, to the contrary. They're saying, in effect, by insisting upon preserving integrity in the workplace and suggesting that that's inconsistent with persons who are homosexual being employed there, doesn't that say to those persons who are homosexual, you shouldn't be here? I don't think that it says that. I mean, how can you read in just the idea that you hate homosexuals just because you want your workplace to have integrity regarding the subject matter that's being discussed, the controversial issues of the day? That's all that the flyer addresses. Is that the definition of integrity? Well, I haven't looked up the definition recently, but integrity has to do with your standards of ethics. Yes. And that is, I don't think that there's anything wrong with that. It's hard to avoid the inference that we lack ethics, we lack integrity, because those people are here. The flyer, in its totality, protect our workplace of integrity. The Good News Employee Association is a forum for people of faith to express their views about contemporary issues of the day with respect for the natural family marriage and family values. That is a very moderate statement. There's no accusation. There's no posting. And Tucker, this Court even suggested that it would be acceptable for someone to post something on the bulletin board that says homosexuality is a sin and put Bible verses in support of that. This is far less aggressive against the homosexual position than that would be. And frankly, if you say that you can't discuss or you can't use the terminology natural family marriage and family values, you essentially silence all speech from that viewpoint. There's nothing else you can say. The clock is now at 640, and you had indicated you wanted to take a few minutes and leave the rest to your colleagues. So I'll let the two of you figure out how you're going to use the rest of your time. It was my understanding that when I was responding to questions, the clock wasn't running, but I guess I can trust it. The clock runs. Thank you. May it please the Court, Richard Ackerman. To address Judge Akuta's question about the qualified immunity question here, if you look at ER 756, there's a specific reference to the Hansen case. And basically what Hansen tells us is that if there's a complete repudiation of the Constitution, then we're not going to get to qualified immunity, which ties right into the questions that Judge Fletcher and Judge Clifton have raised with my colleague, which is, is there anything in the record to suggest that we do indeed have a constitutional battle that rises to the level of being a little more than two employees who simply can't get along? And I quote from ER 620, where there's an e-mail that clearly has my client on it, and there are supervisory officials on there, and it's about the Happy National Coming Out Day, which we know my clients responded to in part with their own club and the flyer. And there are comments in here that say, I understand this is a difficult concept for some who feel the Bible teaches them that sexual identity as a gay or lesbian is wrong. The Bible also says slaves obey your masters and women obey your husbands. I personally think that the good book needs some updating. The psychiatric profession has since seen the light. I think it's time for the rest of the world to catch up. To answer Judge Clifton's inquiry about is there anything in the record, to suggest that we developed a situation where there was going to be an obvious conflict in the forum, in the marketplace of ideas about an issue that was at the very forefront of the nation. As a matter of fact, concurrent with this, we were indeed arguing the same-sex marriage up in San Francisco, and we had the matter of campaign versus California families versus Newsom, which was my case. And it was all over the newspapers. It was unavoidable. The suggestion that people would not be talking over the water fountain, that they would not be talking in the conference room, and that they would not set up clubs to talk about the issues seems unbelievable. And what Mosley tells us, and which we cited to in our briefing, is that if you do actually indeed create a forum, and Rosenberger talks about this, and Rosenberger was cited much more at the trial court level than it was at the appellate court level, but it's relevant in response to the court's questions, is that if you open up a forum as they did with the bulletin board, as they did with the e-mail system, as they did with references to the Bible specifically talking about how it needs updating, the suggestion that an employer can simply say, all right, I don't want you to respond to it because your terms, marriage, family values, integrity, if we're going to talk about integrity in light of A71, the policy that was at stake here, A71, it's section C2, and I believe it's F2, talk about integrity, if what we mean by it is ethics and non-discrimination environment in the workplace, that religious adherents are entitled to as much protection that they must be accommodated, and that's where the Berry case that my colleague here cited to is relevant. They asked for the court to take notice of it late in the game. As a matter of fact, just a couple months ago, they sent a letter or whatever, saying that they'd like you to notice the Berry case, but what Berry talks about is accommodation. Berry realizes that there are going to be conflicts between competing groups and competing ideas and classes of persons that fall squarely within those competing ideas, and to the extent that that's true, Berry does say that we need to accommodate if it is true that they believe that my clients had a legitimate religious belief about this issue, that people knew it, obviously they did, as we can see from ER 620, and what are they going to do to create a peaceful environment in light of Pickering, but also in light of the fact that the city of Oakland, through its e-mail system, bulletin board, and otherwise, opened the forum right up, as in Rosenberger, and as in the Mosley forum analysis, although in Mosley, it was labor unions who were picketing outside versus the city allowing a dispute right within its four walls. Can we get back to Pickering for a moment and to qualified immunity? I guess I'm not understanding why we're not looking at the qualified immunity test. The briefs and the decisions below relate to, particularly your briefs, relate to the Pickering test. The Pickering test was what was applicable, and so we're still needing to see whether there was a violation of the clearly established constitutional right under Pickering in that balancing test. Why isn't that the applicable test? I think that if we look at ER 451 through 466, which deals with the testimony of Mr. Bob, he lays it out squarely for us, and he was asked about, are you aware of First Amendment rights of employees? Answer, yes. What did you do to accommodate those First Amendment rights that you knew were, I'm paraphrasing here, but it is in the record at ER 452 through 466, what were you doing to accommodate? And I asked him very specifically, had religious adherence ever disrupted the work environment in your entire tenure? Answer, no. Do you know if you have Christians working for you? No. Do you know if you have Jews working for you? No. Do you know if you have Muslims working for you? No. Do you know if you have homosexuals working for you? Answer, they're not shy about their position. So there is that knowledge that we're looking for in Hansen, that we're looking under Proprotnick, that we're looking under the Monell lines of cases where you've got an ultimate supervisory authority with policymaking authority who has complete and utter control over the ability to silence somebody. You're squarely within. Right, right. But we're looking for the constitutional violation. And I had some trouble just focusing, you know, what the case was about. And I finally came down to it's about this flyer that was put up in various locations on different bulletin boards and then taken down. And so the issue, it seems to be, is the Employers Act of taking down this flyer a clear constitutional violation under Pickering that the city officials should have known about? Am I wrong in trying to, in that focus of the case? No, because there's a question of law under Poole v. Van Rien, which says that the issue about time, place, and context does involve a legal analysis on your part. And if you find that, yes, the First Amendment was indeed in play here, and you find that based on ER 451 through 466 that the issue was squarely before the supervisory body that was in control, you're well within what you're talking about. You've got the parties are at issue, so to speak, between supervisor and employee under Pickering under Poole. And I submit on that, unless the Court has further questions of me. That's it for now. Thank you. Time has expired, but because we exhausted the time ourselves, we'll still give you a minute for rebuttal between the two of you. And we'll hear from the city. Good morning. May it please the Court, Angela Padilla, Morrison, and Forster. I actually do not represent the city of Oakland on this appeal, the reason being that the city was dismissed below for failure to prosecute, and that portion of the district court's ruling was not subject to this appeal. Accordingly, along with my colleague, Mr. Malau, who's with me on the papers, I represent two individuals, Mr. Robert Bob, who is the former city manager of Oakland, and he apologizes. He could not be here today because he is now the president of the Washington, D.C., school board and has lived in Washington, D.C., in fact, for several years. Sort of like the drying pan to the fire, I guess. Yes, indeed. But my other client, Ms. Joyce Hicks, is indeed here today. And, Joyce, if you'll just acknowledge yourself, please. Ms. Hicks at the time was the deputy director of the Community and Economic Development Agency, which was the agency in which all of these events took place. Ms. Hicks is now the executive director of Oakland's police review board. So I do want to squarely jump right into the qualified immunity question, because I only represent two individuals. The city is no longer in the case and is no longer deemed to be an actor with respect to anything that's at issue here. The appeal raises two issues. One is the personal liability of my two clients, and the other is the official liability. I think we can take the personal liability off the table rapidly, because the facts are undisputed that Mr. Bob, as the city manager, had no involvement whatsoever with any decision to review the flyer, analyze it, or remove it. His role was simply to, as he did in all administrative instructions, perform basically an administrative task of signing and promulgating the administrative instruction at issue in this case. Ms. Hicks, who was a lot closer to the facts here, also had no personal involvement. She was on vacation when the facts arose here. She did not participate in the review of the flyer. She did not participate in any meetings with the individual plaintiffs. And, in fact, she did not take the flyer down. Her role was simply, about six weeks later, to recirculate administrative instruction 71, the AI at issue here, to the group that she was responsible for, the CIDA unit, with a reminder that this policy is, in fact, the city's anti-discrimination ordinance, and it applies. Her cover memo contained a statement that recently there had been an incident with a flyer that was deemed to be homophobic, and that's the word she used, after an investigation by the city, and it was taken down. And she reminds folks, every employee in the department, that they need to abide by the city's anti-discrimination policy, and that failure to do so can result in some form of discipline, including and up to termination. Was it a fair reading of that communication that this particular flyer was homophobic? Yes, indeed, Your Honor. Was it a fair reading of that communication that a flyer or posting of any kind similar to this would be a violation of city policy and could lead to termination? Not exactly, Your Honor, because in this case, the plaintiffs were invited, in fact, to repost their flyer so long as the language, exactly as the Court has noted, about preserving integrity and weeding out the so-called weeds, and that was the word that was used by the plaintiffs in their depositions, and that's in the record, so long as that verbiage, which was the part that was determined to create the risk of anti-homosexual sentiment and anti-homosexual harassment, so long as that verbiage was removed. The First Amendment is supposed to protect robust debate, and I made reference to eggshells before. Part of the overall concern I have here is, if we're concerned about never, ever offending anybody, can you ever have robust debate?  Is the First Amendment intended to protect everybody's feelings so that nobody feels neglected or hurt or abused in any fashion whatsoever? It is, Your Honor, but we are dealing here with the context of a government employer. We are not dealing with the traditional First Amendment notion out on the sidewalks, on the streets, where anything up to fighting words is permitted. Here, and this is again where the qualified immunity test comes in and the test for official liability here, here the city as employer has broader rights to restrict speech than the city or state when it's acting as sovereign, and this case is, I think, easier to decide than many cases that raise the issue of speech in a government workplace for three reasons. The first, as I mentioned, is there was no personal involvement by my two individual clients. The second is that there was an actual disruption in this workplace. This is not a case, as on the Pickering test suggests, where the city or the state as employer must make a reasonable prediction of whether the speech at issue will cause some kind of disruption. Rather, in this case, I think it's an easier call because the speech at issue did cause a disruption. Your Honor is right. This was not a case in which hundreds or dozens of people were severely disrupted. We have the declaration of Ms. Judith Jennings, who was a building inspector in this department, who worked very closely with the plaintiffs in this case. The plaintiffs described their relationship, their employment relationship, with the building inspectors as links in a chain, and the plaintiffs described how they had to align, in a work sense, with the building inspectors to get their job done. So, plainly, when you have a case of actual disruption in the workplace, the Pickering test is... But the disruptions seem to come much more from the discovery that plaintiffs' views on this subject did not correspond with Ms. Jensen, we're talking about? Jennings. Jennings. Not uniquely the flyer. The flyer may have been what brought to the attention of Ms. Jennings that the plaintiffs were none too fond of her lifestyle, but plaintiffs are allowed to have the feelings that they have. Plaintiffs are allowed to believe the California statute should maintain the way it is. Isn't that where the disruption came from? Well, Your Honor, indeed, they are allowed to have those feelings, and they are allowed to have those views, but the question is whether the city, as employer, is required, excuse me, constitutionally, to open its workplace and its channels of communication. Your reaction, because of concern about disruption, you have to anticipate that an announcement about national coming out day is probably not going to make everybody in the office real happy. It's going to upset some people, too, yet the city takes no action and your clients take no action on that front. What's the explanation for treating this particular flyer differently? Indeed, Your Honor. The explanation is that the announcement of coming out day, which, by the way, it is not even clear that that is squarely in the record. In fact, the e-mail that was just mentioned about the Bible needing some revision is from a city council member. I think it's Nancy Nadel, and it's not in the record. It was not authenticated. It's hearsay. It's inadmissible. But to return to the question on what's the difference in the speech, the difference in the speech is as follows. An announcement of the celebration of Martin Luther King's birthday does not require the city to then open up all of its channels of communication to statements by folks who believe in white supremacy or that African-Americans somehow spoil the integrity of the workplace to use those same channels of communication to engage in their speech in the workplace. I think Your Honors both acknowledged that the one speech, happy coming out day, does not violate any anti-discrimination policies. It is an affirmative statement of diversity, whereas a statement that disparages or that poses the risk of anti-gay harassment, as does the flyer at issue here, which states clearly, let's get together to be part of preserving integrity in the workplace, which plainly on its face and as admitted by the plaintiffs in their depositions, is intended to exclude gay men and lesbians and to convey the message that gay men and lesbians do not belong in the workplace or somehow spoil the workplace, or that by virtue of their admission to their sexual orientation, they are somehow discussing private sexual practices that somehow besmirches the governmental workplace. So the analogy here would be Martin Luther King Day announcement does not require the city to open its speech to those who believe in some form of white supremacy or to the so-called counterbalancing form of speech. That might be true on the sidewalks. It might be true in many other public forums, but it's not true here. Well, is the city applying any kind of objective measure of disruption in deciding, I mean, my concern really is I look at this flyer and it's hard, I mean, I understand there are people that react quickly. There are people that find the earliest stages of something that's going to lead to an insult and I can understand the city's concern not to let things get out of hand, but the level of disruption from this flyer, I mean, Ms. Jennings' reaction really wasn't to the flyer. It was to the fact of the discovery that these people didn't have respect toward her lifestyle. That's not the flyer's responsibility. If the city's saying we want to keep disruption out, then it seems to me it was being that vigilant to prevent disruption. It's got to be pretty vigilant in other directions too, and it's not, in fact, that vigilant in other directions as plaintiffs describe it. Now, I've already said I have not found some of the things in the record that have been talked about, and I'll go back and look again, but dealing with the idea now, is the city really being that vigilant to make sure there's no disruption? Indeed, the city is, Your Honor, because as Judge Walker found in doing the Pickering balancing test, here where there has been an actual complaint that a hostile work environment has been created, not just by virtue of the flyer, although that is the actual speech at issue on this appeal, but Pickering requires a highly contextualized analysis, and here the flyer was not standing alone. Your Honor, Your Honors, I believe are aware that in the record here, there was the admission by the plaintiffs that they had also circulated political flyers regarding family values, and those were found in the ladies' room and in various places. There was also an e-mail, a grossly anti-gay e-mail in Spanish placed on the desk of Ms. Jennings, and although the plaintiffs contended that they did not place it there, they did admit that they had received that e-mail at work and had distributed it to other individuals. Furthermore, this flyer, so that's the backdrop. This flyer was posted in various, not just one bulletin board, but in virtually every bulletin board in this particular governmental unit, including right by Ms. Jennings' desk, including right over the copier that she had to use every day, and those very words that trouble this Court, preserving integrity in the workplace, are the very words that Ms. Jennings found troublesome. And when she did ask the plaintiffs, I see your group, could I attend, her declaration states, Ms. Jennings' declaration states very clearly that what came back was sort of a barrage of what really can only be described as a very powerful anti-homosexual sentiment, including statements about Hitler having been gay and Hitler having employed homosexuals. So how should we look at these bulletin boards? Are they non-public forum? Are they limited public forum? And if so, how does the city ensure that whatever restrictions they put, which include taking down these flyers, are viewpoint neutral, which I think is the issue being raised by plaintiffs? Yes. The bulletin boards are not public forums. They certainly are not public forums in any traditional sense. They are limited to governmental employees. Members of the public are not free, and they're not in a location where members of the public might come in and post something about, you know, puppies or whatever it might be. So the only argument that I think the appellants are raising is that somehow the city created a limited public forum by allowing, or at least by they claim, without any evidence in the record, of allowing certain things being posted about, I think, puppies and Osama bin Laden and the Raiders having a terrible season. None of that. I think we can get consent on that one. Yes, indeed. We can all agree on that one. However, none of those particular items have been authenticated. They are not in the record. And here, indeed, the city does attempt to maintain a business-only rule for both the bulletin boards and for the e-mail system. Is that in the record? Well, yes, Your Honor. It's part of what was transmitted along with AI-71 was another AI-140 that relates to use of the city's e-mail system in particular, which discusses use of it for city-related or city-approved purposes. So that's the bulletin board. The bulletin board, I think the only AI on the bulletin board, per se, would be AI-71, which is the anti-discrimination policy. And here, again, it's not by virtue of the plaintiff's membership in a particular religious sect. It's not because they are Christians. That is not why this particular flyer was taken down. They could have been coming from a secular perspective or any perspective. The point was that this particular language actually caused a disruption. And the city found that that disruption and the risk that it might cause further disruption outweighed the vanishingly small, as the district court found, interest that the plaintiffs had in this particular flyer. Because, again, the context here is that alternate channels of communication were made available to the plaintiffs. They were not told that they could not meet. They were not told that they could not form their group. They were not told that they could not speak about these items at other times during the day, over lunch, over breaks, on off-work hours. And, again, I would emphasize the third point here in the Qualified Immunity Analysis that distinguishes this case and makes it easier to decide than most other cases. And the first two were no personal involvement and actual disruption. The third point is that here no adverse employment action was taken against these plaintiffs. In every other case decided in this circuit and the other circuits that have dealt with the Pickering-Connick and Pickering balancing test, what has happened is the government employee has been terminated, demoted, fired, lost some form of pay or benefits. In this instance, this is undisputed, the plaintiffs were not terminated. They lost no benefits. They lost nothing in their pay. But is there an implied threat in the cover memo that went with the recirculation of the policy that flyers of this sort violate our policy and will lead to termination? So clearly there was an implied message, don't talk like this. Don't present information of this sort. Yes, Your Honor. The cover memo which was circulated to everyone and not just these plaintiffs, you could interpret it to mean that this particular language or continuing to do it in the context in which this occurred could lead to some form of discipline. But in this case, it did not. And again, that was because the city, and I really shouldn't speak on behalf of the city, I should speak only on behalf of Mr. Bob and Ms. Hicks, but I can't resist, you know, emphasizing that the city tried to be as tolerant as possible in terms of not disciplining these plaintiffs, not doing anything to affect their employment status, and inviting them again to recraft this flyer so that it passed muster under the anti-discrimination policy and properly balanced the employee's right to speak on these subjects which do touch on a matter of public concern against the employer's interest and need to maintain a harmonious and efficiently running governmental workplace. I don't have anything further to add, Your Honor. I'd be very happy to discuss the other issues. I know I only have about two minutes left that were raised in addition to the free speech for the assembly, association, and equal protection matters, although I think those are fully addressed in the briefs and in sum, I would suggest to the Court that Judge Walker here really navigated the scylla and charybdis of the Pickering balance test with great nuance and with, I think, a very, what I'd say was a very conservative, with a small c, approach to Pickering in terms of looking at the city's interest in maintaining its workplace balanced against the plaintiff's interest in this particular flyer. And there's nothing in the record to suggest that all mentions of marriage are prohibited by AI-71 or all mentions of family values are prohibited. It's one particular flyer. And with regard to the prospect of relief that was sought, we believe and we submit that Judge Walker correctly concluded that this case raises a very narrow factual question of this particular flyer and that the parade of horribles and the slippery slope that are usually raised in these First Amendment cases are not right for the Court's consideration and have not yet arisen. And with that, I will close unless the Court has any further questions. Thank you. Thank you. Indicated I'd give you another minute, so please take it. I'll do my best to make it a good minute. One thing that's being lost here is that how we got knocked out at the trial court level was on a motion for summary judgment. And many of the issues that have been talked about today, including, well, was it Martin Luther King? Was it the Iraq War? Was it the Chicanos' altar day for the Day of the Dead? Which of these items here in the record was it, as she indicates, simply neutral versus that which gave rise to this battle between two competing views? And the standard on a motion for summary judgment is, is that you're to view this in the light most favorable to the nonmoving party, which would be us, if indeed there is a factual issue. And we submit there is, and I think that today's arguments underscore that fundamental point. And it also ties right into the immunity issue. There are preliminary factual questions that need to be addressed in this First Amendment context under POOL, which is time, place, manner, the context, and how it affected the performance of employees, which are all tribal issues of fact, which we never got to because the trial court never got into the very debate that we're having before you today. I submit. Thank you for the argument. We'll ask all counsel. The basis of the argument is submitted.
judges: B. Fletcher, Clifton, Ikuta